1

2

3

4

5

6

7

8                        **IN THE UNITED STATES DISTRICT COURT**

9                        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    RAINA ROCHERT,                        No.  2:20-CV-1368-DMC

12                    Plaintiff,

13          v.                              MEMORANDUM OPINION AND ORDER

14    COMMISSIONER OF SOCIAL
      SECURITY,
15
                      Defendant.
16

17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20    Pursuant to the written consent of all parties, ECF Nos. 6 and 7, this case is before the

21    undersigned as the presiding judge for all purposes, including entry of final judgment.  See 28

22    U.S.C. § 636(c).  Pending before the Court are the parties' briefs on the merits, ECF Nos. 12 and

23    16.

24              The Court reviews the Commissioner's final decision to determine whether it is:

25    (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

26    whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

27    more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

28    (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support

1  a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

2  including both the evidence that supports and detracts from the Commissioner's conclusion, must

3  be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

4  v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The Court may not affirm the Commissioner's

5  decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

6  Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

7  findings, or if there is conflicting evidence supporting a particular finding, the finding of the

8  Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

9  Therefore, where the evidence is susceptible to more than one rational interpretation, one of

10  which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

11  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

12  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

13  Cir. 1988).

14         For the reasons discussed below, the matter will be remanded for further

15  proceedings.

16

17              **I.  THE DISABILITY EVALUATION PROCESS**

18         To achieve uniformity of decisions, the Commissioner employs a five-step

19  sequential evaluation process to determine whether a claimant is disabled.  See 20 C.F.R. §§

20  404.1520 (a)-(f) and 416.920(a)-(f).   The sequential evaluation proceeds as follows:

21         Step 1      Determination whether the claimant is engaged in

22                     substantial gainful activity; if so, the claimant is presumed
                       not disabled and the claim is denied;

23         Step 2      If the claimant is not engaged in substantial gainful activity,

24                     determination whether the claimant has a severe
                       impairment; if not, the claimant is presumed not disabled

25                     and the claim is denied;

26         Step 3      If the claimant has one or more severe impairments,

27                     determination whether any such severe impairment meets
                       or medically equals an impairment listed in the regulations;
                       if the claimant has such an impairment, the claimant is

28                     presumed disabled and the claim is granted;

2

| | | |
|---|---|---|
| Step 4 | | If the claimant's impairment is not listed in the regulations, determination whether the impairment prevents the claimant from performing past work in light of the claimant's residual functional capacity; if not, the claimant is presumed not disabled and the claim is denied; |
| Step 5 | | If the impairment prevents the claimant from performing past work, determination whether, in light of the claimant's residual functional capacity, the claimant can engage in other types of substantial gainful work that exist in the national economy; if so, the claimant is not disabled and the claim is denied. |

See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).

To qualify for benefits, the claimant must establish the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted, or can be expected to last, a continuous period of not less than 12 months.  See 42 U.S.C. § 1382c(a)(3)(A).  The claimant must provide evidence of a physical or mental impairment of such severity the claimant is unable to engage in previous work and cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989).  The claimant has the initial burden of proving the existence of a disability.  See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The claimant establishes a prima facie case by showing that a physical or mental impairment prevents the claimant from engaging in previous work.  See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f).  If the claimant establishes a prima facie case, the burden then shifts to the Commissioner to show the claimant can perform other work existing in the national economy.  See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Hammock v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).

///

///

///

///

3

## II.  THE COMMISSIONER'S FINDINGS

Plaintiff applied for social security benefits on March 14, 2017.  See CAR 17.[1]

Plaintiff claims disability began on January 3, 2013.  See id.  Plaintiff's claim was initially

denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which

was held on August 8, 2018, before Administrative Law Judge (ALJ) Jane M. Maccione.  In a

March 22, 2019, decision, the ALJ concluded plaintiff is not disabled based on the following

relevant findings:

> 1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2018.
>
> 2.  Through the date last insured, the claimant had the following severe impairment(s): leukemia, tinnitus, attention deficit hyperactivity disorder (ADHD), depression, and anxiety;
>
> 3.  Through the date last insured, the claimant did not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;
>
> 4.  Through the date last insured the claimant had the following residual functional capacity: the claimant could perform medium work; she was frequently able to understand, remember, and carry our detailed and complex instructions; she required a work environment with little change to the setting and routine; and she was limited to a workplace with a noise level of moderate or less;
>
> 5.  Considering the claimant's age, education, work experience, residual functional capacity, and vocational expert testimony, through the date last insured the claimant was able to perform her past relevant work as a paralegal and attorney.
>
> See id. at 20-32.

After the Appeals Council declined review on May 15, 2020, this appeal followed.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[1]      Citations are the to the Certified Administrative Record (CAR) lodged on October 1, 2020.  See ECF No. 9.

### III.  DISCUSSION

In her opening brief, Plaintiff argues: (1) the ALJ erred in evaluating the medical opinion evidence; (2) the ALJ erred in evaluating Plaintiff's testimony and statements; (3) the ALJ erred in evaluating lay witness evidence; and (4) the ALJ's finding that Plaintiff could return to her past relevant work is not supported by substantial evidence.

### A.    Medical Opinion Evidence

"The ALJ must consider all medical opinion evidence." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)).  The ALJ errs by not explicitly rejecting a medical opinion.  See Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014).  The ALJ also errs by failing to set forth sufficient reasons for crediting one medical opinion over another.  See id.

Under the regulations, only "licensed physicians and certain qualified specialists" are considered acceptable medical sources.  20 C.F.R. § 404.1513(a); see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012).  Where the acceptable medical source opinion is based on an examination, the ". . . physician's opinion alone constitutes substantial evidence, because it rests on his own independent examination of the claimant." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  The opinions of non-examining professionals may also constitute substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.  See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).  Social workers are not considered an acceptable medical source.  See Turner v. Comm'r of Soc. Sec. Admin., 613 F.3d 1217, 1223-24 (9th Cir. 2010).  Nurse practitioners and physician assistants also are not acceptable medical sources.  See Dale v. Colvin, 823 F.3d 941, 943 (9th Cir. 2016). Opinions from "other sources" such as nurse practitioners, physician assistants, and social workers may be discounted provided the ALJ provides reasons germane to each source for doing so.  See Popa v. Berryhill, 872 F.3d 901, 906 (9th Cir. 2017), but see Revels v. Berryhill, 874 F.3d 648, 655 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(f)(1) and describing circumstance when opinions from "other sources" may be considered acceptable medical opinions).

/ / /

5

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether: (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see

1   also Magallanes, 881 F.2d at 751.

2           At Step 4, the ALJ evaluated the medial opinion evidence of record to determine

3   Plaintiff's residual functional capacity.  See CAR 25-30.  The ALJ gave the opinions of Dr. Ju, an

4   agency reviewing doctor, "partial weight."  See id. at 25-26.  The ALJ gave the opinions of Drs.

5   Dipsia and Samplay, also agency reviewing doctors, "great weight."  See id. at 26.  The ALJ gave

6   the opinions of Dr. Renner, another agency reviewing doctor, "little weight."  See id. at 26-27.

7   The ALJ gave the opinions of Dr. Dhillon, Plaintiff's treating doctor, "little weight."  See id. at

8   27-28.  The ALJ gave the opinions of Dr. Ng, also a treating source, "little weight."  See id. at 28.

9   The ALJ gave the opinions of Dr. Vitug, another treating source, "little weight."  See id.  Finally,

10  the ALJ gave the opinions of Dr. Stenbeck, an agency examining doctor, "partial weight."  See id.

11  at 29-30.

12          Plaintiff challenges the ALJ's analysis as to Drs. Dhillon, Ng, Stenbeck, Ju,

13  Dipsia, and Samplay.

14          1.      Dr. Dhillon

15          As to Dr. Dhillon, the ALJ stated:

16      The claimant's provider Dr. Dhillon submitted several medical source
        statements.  The first is dated September 8, 2017, wherein Dr. Dhillon
17      diagnosed the claimant with a mood disorder with depressive features,
        anxiety, and ADHD.  Dr. Dhillon opined the claimant overall had
18      moderate limitations in functioning.  However, Dr. Dhillon opined the
        claimant had marked limitations in the following: ability to remember
19      locations and work-like procedures; ability to understand and remember
        detailed instructions; ability to carry out detailed instructions; ability to
20      maintain attention and concentration for extended periods; and ability to
        complete a normal workday and workweek without interruptions from
21      psychologically based symptoms and to perform at a consistent pace
        without an unreasonable number and length of rest periods (Exhibit 6F).
22

23      Subsequently in a more recent opinion dated July 30, 2018, Dr. Dhillon
        diagnosed the claimant with a mood disorder with depressive features,
24      generalized anxiety disorder, and attention deficit hyperactivity disorder
        inattentive type.  Dr. Dhillon opined the claimant had marked limitations
25      in the following areas: ability to remember locations and work-like
        procedures; ability to understand and remember detailed instructions;
26      ability to carry out detailed instructions; ability to maintain attention and
        concentration for extended periods; and ability to complete a normal
27      workday and workweek without interruptions from psychologically based
        symptoms and to perform at a consistent pace without an unreasonable
28      number and length of rest periods (Exhibits 11F; and 13F pages 3 to 5).

1
2
3
4
5
6
7
8
9
10
11
12

> The opinion of Dr. Dhillon is given little weight.  While the opinions are based upon a treatment relationship with the claimant, the limitations identified in each opinion is [sic] inconsistent with the claimant's mental health treatment history and mental status findings.  The records reveal the claimant has a history of mental health treatment and since January 2013, has continued to undergo medication treatment with regular medication monitoring.  Overall, these records reveal improvement with treatment and the level of care she has required has remained routine and at times intermittent.  The record does not indicate the claimant underwent evaluation for a higher level of treatment, in fact at one point in time declined further evaluation.  She has not required hospital evaluation or care.  She does not require support services and has identified being able to engage in many activities inconsistent with these opinions.  While these are discussed in greater detail above, these include her ability to work, maintain relationships, manage appointments, care for herself, care for household pets, travel, exercise, drive, watch television, and play games on her phone.  Moreover, as discussed above, the record includes documentation generated by the claimant which is completed with great accuracy and detail.  Furthermore, the opinions do not define the categories or what extent the limitations have upon various activities.  These appear to be criteria different than those utilized by the Social Security Agency.  As they are undefined, they are overall vague as to what extent the claimant is limited in her activities.  There is also little discussion about what findings support the limitations and opinions.

13
14

CAR 27-28.

15
16
17
18
19
20

Plaintiff contends: (1) the ALJ inaccurately stated that each of the limitations identified by Dr. Dhillon is inconsistent with Plaintiff's mental health treatment history and objective findings; (2) the ALJ failed to consider the limited extent of Plaintiff's daily activities; (3) the ALJ improperly relied on Plaintiff's ability to prepare documents associated with her disability claim; and (4) the ALJ incorrectly determined that Dr. Dhillon's report failed to define categories of limitations on various activities.  See ECF No. 12-1, pgs. 16-19.

21
22
23
24
25
26
27
28

Dr. Dhillon's opinions are contained in Exhibits 6F, CAR 744-47, and Exhibit 11F, CAR 774-77.  Both are check-the-box forms evaluating Plaintiff's mental residual functional capacity.  See id.  Exhibit 7F is an evaluation dated September 6, 2017.  See id. at 744-47.  Exhibit 11F is an updated evaluation dated July 30, 2018.  See id. at 774-77.  In Exhibit 6F, Dr. Dhillon opined that Plaintiff has marked mental limitations in the following areas of functioning: (1) ability to remember locations and work-like procedures; (2) ability to understand and remember detailed instructions; (3) ability to carry out detailed instructions; (4) ability to maintain attention and concentration for extended periods; and (5) the ability to complete a

1  normal workday and workweek without interruptions from psychologically based symptoms.  See

2  id. at 744-47.  In support of these opinions, Dr. Dhillon cites generally "her symptoms of

3  distractibility, forgetfulness, increased anxiety."  Id. at 746.  The doctor also states that Plaintiff's

4  leukemia contributes to "memory issues," but does not explain the mechanism of this problem.

5  Id.  Dr. Dhillon expressed the same functional opinions in the July 2018 evaluation at Exhibit

6  11F.  See id. at 774-77.  As with the September 2017 opinion, Dr. Dhillon cites "distractibility,

7  inattention, anxiety, forgetfulness" in support of the July 2018 opinion.  See id. at 777.

8      Among other reasons for rejecting Dr. Dhillon's opinions, the ALJ noted that the

9  opinions are not supported by a "discussion about what findings support the limitations and

10  opinions."  CAR 28.  The Court finds this determination is an appropriate reason to supported by

11  substantial evidence.  See Meanel, 172 F.3d at 1113; see also Magallanes, 881 F.2d at 751.  As

12  the ALJ correctly observed, Dr. Dhillon does not state which objective findings and clinical data

13  support each specific opinion of marked limitations.  The ALJ is entitled to reject such

14  unsupported opinions.  See id.

15      2.   Dr. Ng

16  Regarding opinions expressed by Dr. Ng, the ALJ stated:

17  There is an activity status report dated July 16, 2018, authored by Chun
   Ng, M.D., where in the claimant was placed off activity from July 16,
18  2018, through October 13, 2018.  Her diagnosis was identified as Chronic
   Myeloid Leukemia.  Her condition and medications used to treat the
19  condition cause significant fatigue limiting the usual daily activities
   (Exhibits 10F page 2; and 13F page 7).
20
   The opinion of Dr. Ng is given little weight.  While the opinion is based
21  upon a treatment relationship with the claimant, the opinion provides no
   specific findings regarding how the claimant is limited in her ability to
22  work.  Additionally, the statement she is limited in her activities of daily
   living is inconsistent overall with other evidence of her activities during
23  this time.  This includes statements from the claimant and her spouse,
   discussed above.  In addition, the opinion appears to be a temporary
24  limitation on work activity.  While it was noted Dr. Ng. was unable to
   provide a note of longer duration due to policy, it was noted the claimant
25  would be unable to return to work for the foreseeable future based upon
   side effects and pain.  Again, this is [sic] opinion is vague as to what
26  limitations she has in her ability to work and appears to be temporary in
   duration.  Overall, the opinion is inconsistent with the claimant's treatment
27  history, her present treatment needs, statements, objective and diagnostic
   findings, and evidence of her activities during this time.  Furthermore, the
28  issue concerning the claimant's ability to work is not a medical issue

9

1      regarding the nature and severity of an individual's impairment(s) but is
       an administrative findings that is dispositive of the case that would direct a
2      determination of a decision of disability.  Under CFR 416.927([d]), the
       final responsibility for deciding this issue is reserved to the Commissioner.

3
       CAR 28.
4

5      Plaintiff argues:

6              It is clear from Dr. Ng's statement that in his opinion, due to Ms.
       Rochert's fatigue and CML, she was unable to sustain the activities
7      required of her work. (Tr. 769). This opinion is significant in that it
       provides additional support for Dr. Dhillon's more specific opinion and
8      corroborates Ms. Rochert's subjective complaints. However, the ALJ
       incorrectly asserted that Ms. Rochert was not limited in her daily living
9      activities, when as discussed above, this misstates the record. *See* pages
       13-14, *supra*. The ALJ's claim that "[i]n addition, the opinion appears to
10     be temporary limitation on work activity" (Tr. 28) is misleading. Indeed,
       it is unclear why the ALJ relied on this claim when the ALJ then
11     acknowledged that "it was noted Dr. Ng was unable to provide a note of
       longer duration due to policy" and that "the claimant would be unable to
12     return to work for the foreseeable future based upon side effects and pain."
       *Id.* Nevertheless, the ALJ repeated that opinion "appears to be temporary
13     in duration" when this is directly undermined by Ng's explanation. *Id.*

14     ECF No. 12-1, pgs. 19-20.

15             Dr. Ng's opinions are contained in Exhibit 10F, CAR 765-73, and Exhibit 13F,

16     CAR 925-47. Exhibit 10F contains an "Activity Status Report" dated July 16, 2018. See id. at

17     766.  In this report, Dr. Ng states that Plaintiff is "placed off activity from 7/16/2018 through

18     10/13/2018" due to "significant fatigue limiting the usual daily activities" resulting from

19     medications related to Plaintiff's leukemia.  Id.  Dr. Ng does not specify which "usual daily

20     activities" are limited by Plaintiff's medications or specify the nature or degree of such

21     limitations.  Exhibit 10F also contains a single oncology follow-up note, dated July 16, 2018, in

22     which Dr. Ng notes a medication change due to prior medication causing tinnitus.  See id. at 767.

23     Dr. Ng opined that Plaintiff "is unlikely to be able to return to work for the foreseeable future

24     based on her side effects."  Id.  Relative to Dr. Ng, Exhibit 13F contains the same records.  See id.

25     at 925-47.

26     / / /

27     / / /

28     / / /

1    The ALJ rejected Dr. Ng's opinion because it was temporary in duration, vague as

2    to the nature of the limitations resulting from fatigue, and addressed the ultimate issue of

3    Plaintiff's ability to work reserved to the Commissioner.  See id. at 28.  The Court finds no error

4    in this analysis, which is supported by correct legal reasoning and substantial evidence.  First, as

5    the ALJ correctly notes, whether Plaintiff is able to engage in work activity is the ultimate issue

6    of disability reserved to the Commissioner.  See 42 C.F.R. § 416.927(d)(1) (applicable to claims

7    filed before March 27, 2017).  Second, Dr. Ng's opinion of an inability to work for a period less

8    than 12 months fails to meet the duration requirement of the Social Security Act.  See 42 U.S.C.

9    § 423(d)(1); see also 42 C.F.R. § 404.1512.  Finally, as noted above, the ALJ is not required to

10   accept conclusory opinions which, as here, are unsupported by reference to objective findings.

11   See Meanel, 172 F.3d at 1113; see also Magallanes, 881 F.2d at 751.

12            3.    Dr. Stenbeck

13       As to Dr. Stenbeck, the ALJ stated:

14       At the request of this Agency, the claimant underwent a comprehensive
         mental status evaluation on November 15, 2017, with Lauri Stenbeck,
15       Ph.D., wherein Dr. Stenbeck diagnosed the claimant with generalized
         anxiety disorder, depressive disorder, NOS, and attention deficit
16       hyperactivity disorder predominantly inattentive type (by history).
         Additionally, the claimant was assigned a Global Assessment of
17       Functioning (hereinafter referred to as "GAF") score of 46.  The GAF
         scale indicates the clinician's judgment of the individual's overall level of
18       functioning.  It is measured using a scale of 1 to 100, with 1 being
         persistent danger of hurting self or others and 100 being no symptoms.  A
19       score between the range of 41 to 50 indicates a serious impairment in
         social, occupation, or school functioning.
20
         Dr. Stenbeck opined the claimant had no significant limitations with
21       performing simple and repetitive tasks.  She had mild limitations in
         performing detailed and complex tasks and maintaining regular attendance
22       in the workplace.  She has moderate limitations with ability to interact
         with coworkers and the public, and ability to deal with the usual stresses
23       encountered in a competitive work environment.  It was noted she may
         require step-by-step instructions for complex tasks given memory and
24       attention difficulties and supervision.  She may have difficulty accepting
         constructive criticism due to anxiety and will likely require gentle
25       feedback.  The claimant was noted to report isolating and avoiding others.
         She was noted to become easily overwhelmed when in a stressful work
26       environment.  However, Dr. Stenbeck opined the claimant was capable of
         managing funds (Exhibit 7F).
27

28   / / /

11

The opinion of Dr. Stenbeck is given partial weight.  While the opinion is based upon a comprehensive review of evidence in the record and examination of the claimant, evidence introduced at the hearing level establishes the claimant has no limitations in social functioning as outlined in the findings above.  This evidence includes her ability to maintain friendships, work, travel and visit with family, shop, participate in exercise classes, and maintain relationships with providers.  Otherwise, the opinion regarding the claimant's cognitive and adaptive functioning is supported by the evidence in the record.  While the claimant has reported ongoing memory loss and difficulties with concentration and focus, the record as to her activities is consistent with her allegations.  This includes her ability to play games on her phone, perform clerical and probate work, maintain her practice, attend to her personal care and hygiene, care for household pets, prepare meals, provide reliable information, and communicate with others.  Additionally, the record includes multiple statements and/or forms prepared by the claimant which clearly and articulately outline her treatment and employment history and other communications concerning evidence admitted as part of the record.

Additionally, the following findings, statements, and observations noted by Dr. Stenbeck during the examination are consistent overall with evidence in the record, findings herein, and the residual functional capacity assessment above.

Dr. Stenbeck noted the claimant presented as cooperative and polite with noted depressive and anxiety symptoms.  The claimant arrived on time for her appointment and was driven there by her spouse.  She was a reliable historian.  Her attire was clean and grooming good.  She presented in a friendly manner.  Her eye contact was good.  Her facial expression normal.  Her gross motor function was normal.  She was able to ambulate without assistance.  She interacted appropriately with the examiner throughout the evaluation.  No bizarre behavior was observed.

During the examination, the claimant reported anxiety, depression/mood disturbance, and ADHD.  She reported problems with memory, which she believes is secondary to undergoing chemotherapy treatment.  She has difficulty with concentration, focus, and attention.  She is anxious and overwhelmed by simple tasks such as household chores.  She feels anxious when talking on the phone.  She is easily agitated and can be irritable to others.  In addition, she experiences sadness and low energy.

The claimant reported being diagnosed with ADHD twenty years earlier and started on medication which she has taken consistently since that time.  She began struggling with depression and anxiety for at least ten years.  At that time, she was started on medication for her mood and received therapy for a few years.  These symptoms occur daily and are moderate in severity.  Compared to when they began, she stated they were better and less persistent.  She reported her symptoms are improved with medication.

She reported feeling anxious and tired.  Her current mental health symptoms impact her daily living.  She does not want to do anything or go outside.  However, at the time she was not prescribed psychotropic medication.

/ / /

12

She has no history of suicide or psychiatric hospitalization.  She has no history of self-injurious or cutting behavior.

The claimant reported a steady work history.  She attempted to return to work in 2015 but was unable to handle working.  She reported significant difficulties getting along with her former boss and this contributed to her stress.  She reported being able to manage funds independently and appropriately.

The claimant denied physical limitations due to medical problems.  She has no significant difficulties with bending, lifting, or standing for long periods of time.  She is independent for basic ADL's and does not need help preparing meals.  She has difficulty completing household chores due to anxiety and low energy.  She is able to make change at the store.  She spends an average day at home watching television or playing on her phone.

Her adaptive functioning was noted to be adequate.  She had pressured speech.  Her intelligence was intact.  However, her attention was impaired.  She was able to recite a minimum of four digits forward and three digits in reverse.  Her concentration was impaired.  She had adequate fund of knowledge for current events.  Her abstraction, proverbs, calculations, judgment, and insight were intact.

CAR 29-30.

As to the GAF score noted by Stenbeck, the ALJ gave the assessment little weight.

See id. at 30.  The ALJ stated:

. . .This subjective all-in-one Global Assessment of Function tool was devised by the American Psychiatric Association as a generalized snapshot of an individual's mental health at a particular point in time, expressed as a number between 0 and 100.  These scores were not intended for forensic purposed, such as assessment of disability, competency, or the individual's control over such behavior (citation omitted).  The Commissioner has declined to endorse the GAF scale for "use in Social Security and SSI disability programs," and has indicated GAF scores have no "direct correlation to the severity requirements [of the] mental disorders listings."  65 Fed. Reg. 50764-65 (2000).  The American Psychiatric Association abandoned use of GAF scores with its 2013 publication of the Fifth Edition of its Diagnostic and Statistical Manual of Mental Disorders (DSM-V), citing various concerns relating to the reliability of these scores.  Furthermore, a GAF score is not intended to be a longitudinal assessment and does not correlate to any specific vocational or functional limitation, so is of limited utility here.

Id. at 30-31.

/ / /

/ / /

/ / /

13

1    According to Plaintiff:

2        In giving "partial weight" to Dr. Stenbeck's opinion, the ALJ
         essentially repeated her rationale for rejecting the other medical opinions
3        of record. (Tr. 29). For the reasons discussed above, this rationale is
         erroneous. While the activities cited by the ALJ show that Ms. Rochert has
4        some ability to function, they are consistent with the medical opinions
         from Dr. Stenbeck, as well as those from treating sources such as Dr.
5        Dhillon. *See* pages 13-14, *supra*. In the context of Dr. Stenbeck's thorough
         report, the ALJ's findings cannot be sustained. The Commissioner's own
6        chosen examiner provided detailed information supporting limitations
         beyond those acknowledged by the ALJ, and yet the ALJ failed even to
7        address a number of key findings.

8    ECF No. 12-1, pg. 21.

9        Dr. Stenbeck's report following her November 15, 2017, examination of Plaintiff

10   is contained in the record as Exhibit 7F.  See CAR 748-53.  On mental status examination, the

11   doctor observed that the following categories of functioning were impaired: (1) attention;

12   (2) concentration; and (3) memory.  See id. at 750-51.  Dr. Stenbeck did not find any marked

13   limitations.  See id. at 752.  The doctor assessed moderate limitation with respect to social

14   functioning, such as Plaintiff's ability to accept instructions from supervisors and interact with

15   coworkers and the public.  See id.  Dr. Stenbeck also noted that Plaintiff "may benefit from

16   starting therapy. . . ."  Id. at 752-53.

17       The ALJ assigned Dr. Stenbeck's opinion partial weight, rejecting the doctor's

18   assessment of moderate limitations in social functioning.  See id. at 29-30.  The Court finds this

19   conclusion to be consistent with the doctor's own report of clinical findings.  Specifically, Dr.

20   Stenbeck observed on objective examination that Plaintiff's "adaptive functioning for

21   *social/interpersonal* skills is adequate."  Id. at 750 (italics in original).  Moreover, the Court notes

22   that Plaintiff did not report to Dr. Stenbeck any problems related to social interactions.  See id. at

23   749.  Rather, Plaintiff described her limitations as stemming primarily from fatigue.  See id.  In

24   this regard, it is noteworthy that Dr. Ng, a treating source whose opinions Plaintiff asserts should

25   have been accepted as discussed above, did not opine as to any limitations with respect to social

26   functioning.  Dr. Stenbeck's opinion of moderate limitations in social functioning is simply not

27   supported by his own objective observation that Plaintiff's social and interpersonal functioning

28   are adequate.  The ALJ properly rejected the doctor's unsupported opinion of moderate

                                            14

1   limitations in social functioning.  See Meanel, 172 F.3d at 1113; see also Magallanes, 881 F.2d at

2   751.

3                    4.    Dr. Ju

4            With respect to opinions offered by Dr. Ju, the ALJ stated:

5            . . .[A]t the request of this Agency, Winifred C. Ju, Ph.D., reviewed the
             evidence in the record and thereafter opined the claimant is capable of
6            sustaining concentration, persistence, or pace to perform detailed tasks and
             some complex tasks in a low stress work environment.  She would be
7            incapable of performing complex and detailed tasks under normal
             workday stressors due to low distress tolerance and poor emotion
8            regulation secondary to depression and anxiety.  The claimant would
             require a supportive supervisor, but she would not require special
9            supervision.  She would respond ineffectively with a confrontational/
             adversarial supervisory style due to low distress tolerance and poor
10           emotion regulation secondary to depression and anxiety.  The claimant
             requires low stress work involving a predictable work environment with
11           few changes (Exhibit 3A).

12           The opinion of Dr. Ju is given partial weight.  While the opinion is based
             upon a comprehensive review of evidence in the record, the evidence
13           introduced at the hearing level establishes the claimant has no limitations
             in social functioning as outlined in the findings above.  This evidence
14           includes her ability to maintain friendships, work, travel, and visit with
             family, shop, participate in exercise classes, and maintain relationships
15           with providers.  Otherwise, the opinion regarding the claimant's cognitive
             and adaptive functioning is supported by the evidence in the record.
16           While the claimant has reported ongoing memory loss and difficulties with
             concentration and focus, the record as to her activities is consistent with
17           her allegations.  This includes her ability to play games on her phone,
             perform clerical and probate work, maintain her practice, attend to her
18           personal care and hygiene, care for household pets, prepare meals, provide
             reliable information, and communicate with others.  Additionally, the
19           record includes multiple statements and/or forms prepared by the claimant
             which clearly and articulately outline her treatment and employment
20           history and other communications concerning evidence admitted as part of
             the record.
21
22           CAR 25-26.

23           Plaintiff contends:

24                   Dr. Ju provided an explanation including a medical opinion that
             Ms. Rochert's problems with attention and concentration "are most
25           probably manifestations of her severe depression and anxiety." (Tr. 122).
             Dr. Ju pointed to the existence of "objective evidence showing pattern of
26           waxing and waning sxs over time r/t her emotional vulnerability to
             situational stressors as well as the clmt's subjective evidence," id., which
27           is especially relevant in cases involving mental impairments. This
             highlights one of the fundamental flaws infecting the ALJ's analysis: a

28

                                                15

failure to fully account for the waxing and waning nature of mental illness, which inherently produces both good and bad days.

ECF No. 12-1, pg. 23.

Dr. Ju's report is contained in the record at Exhibit 3A.  See CAR 115-30.  Dr. Ju concluded, based on a review of records, that Plaintiff was moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods of time.  See id. at 126.  Dr. Ju further opined:

Clmt is capable of sustaining c/p/p [concentration/persistence/pace] to perform detailed tasks and some complex tasks in a low stress work environment.  She would be incapable of performing complex detailed tasks under normal workplace stressors. . . ."

Id. (emphasis added).

Finally, Dr. Ju opined that Plaintiff is "not significantly limited" in her ability to interact with the general public, accept instruction and criticism from supervisors, or get along with coworkers. See id.

The ALJ gave these opinions partial weight.  See id.  In doing so, however, the ALJ's analysis is less than clear and, in some instances, inconsistent.  For example, the ALJ appears to reject an opinion of some limitations in social functioning, yet Dr. Ju opined that Plaintiff is "not significantly limited" in this area.  Likewise, as to problems with ongoing memory loss and difficulties with concentration and focus, the ALJ's finding is less than clear. The ALJ stated: "While the claimant has reported ongoing memory loss and difficulties with concentration and focus, the record as to her activities is consistent with her allegations."  Id.  The use of the word "while" in the first clause suggests that the second clause of the sentence will contradict the first.  The ALJ, however, states in the second clause that the record of Plaintiff's activities is "consistent" with her allegations.  It is thus unclear whether the ALJ found Plaintiff's allegations consistent or inconsistent with the objective record.  Similarly, it is unclear whether the ALJ accepted or rejected Dr. Ju's opinions regarding memory and concentration.  To the extent the ALJ rejected any of Dr. Ju's opinions, the Court is hard-pressed to understand why.

/ / /

16

1    The Court finds that the matter should be remanded to allow for further

2  consideration of Dr. Ju's opinions.

3         Drs. Dipsia and Samplay

4         As to Drs. Dipsia and Samplay, the ALJ stated:

5         At the request of this Agency, A. Dipsia, M.D., and H. Samplay, M.D.,
          reviewed the evidence in the record and thereafter opined the claimant
6         could lift and/or carry fifty pounds occasionally and twenty-five pounds
          frequently.  She can stand and/or walk (with normal breaks) for a total of
7         about six hours in an eight-hour workday.  She can sit (with normal
          breaks) for a total of about six hours in an eight-hour workday (Exhibits
8         1A; and 3A).

9         The opinions of Dr. Dipsia and Dr. Samplay are given great weight.
          These opinions are based upon a comprehensive review of evidence in the
10        record and are overall consistent with the claimant's treatment history,
          objective findings, diagnostic findings, statements of third parties and the
11        claimant, and her activities.  This includes evidence her treatment for
          leukemia and tinnitus has managed and improved her conditions and any
12        related symptoms.  While she continues to experience reported fatigue, as
          discussed above in greater detail, she presents for her appoints as alert,
13        oriented, and in no distress.  She engages in many regular activities and
          has been able to maintain her personal care and hygiene, travel, work, and
14        remain home alone while her spouse is working and during this time was
          independent in her activities.  As discussed above, lab studies revealed her
15        treatment was effective in treating her condition.  The claimant has
          reported her tinnitus improved with medication changes, and this is
16        consistent with her treatment record and activities.  Furthermore, these
          opinions include a detailed discussion of the evidence and findings
17        reviewed and relied upon in the opinions.

18        CAR 26.

19        Plaintiff argues:

20           The ALJ found that the evidence was consistent with "[t]he
          opinions of Dr. Dipsia and Dr. Samplay" which were "given great
21        weight." (Tr. 26). This ignores the great deal of evidence including both
          treatment records and medical opinion evidence that entered the record
22        after these nonexamining sources reviewed Ms. Rochert's file. The
          regulations provide that the extent to which a medical source is familiar
23        with the other evidence in the case is a factor that an ALJ is to consider in
          determining the weight to which a medical opinion is entitled. *See* 20
24        C.F.R. § 404.1520c(c)(5). Here, the ALJ erroneously discounted more
          recent opinions from sources who examined and treated Ms. Rochert, and
25        who based their opinions on a more complete record. The ALJ's
          determination to instead afford great weight to the outdated opinions of
26        Dr. Dipsia and Dr. Samplay cannot be deemed based on substantial
          evidence.
27
          ECF No. 12-1, pg. 24.
28

1    Drs. Dipsia and Samplay, who reviewed records, provided opinions regarding

2    Plaintiff's physical residual functional capacity.  These doctors' opinions are contained in the

3    record at Exhibit 1A, CAR 101-13, and Exhibit 3A, CAR 115-30.  On September 27, 2017, Dr.

4    Samplay opined that Plaintiff can frequently lift and/or carry 25 pounds and occasionally lift

5    and/or carry 50 pounds, sit/stand/walk for 6 hours in an 8-hour day, and is unlimited in all other

6    respects.  See id. at 124-25.  Dr. Dipsia rendered the same opinion on April 18, 2017.  See id. at

7    110-11.  The ALJ gave these opinions great weight.  See id. at26.

8    Plaintiff argues the ALJ erred in relying on the opinions of Drs. Dipsia and

9    Samplay because they are outdated.  This argument is unpersuasive.  The Court notes that Dr.

10    Dhillon, whose conclusions Plaintiff contends should have been fully accepted, rendered opinions

11    in September 2017 – the same month Dr. Samplay rendered his opinion.  Likewise, Dr. Stenbeck

12    rendered her opinions in November 2017, and Dr. Ju rendered her opinions in December 2017.

13    If, as Plaintiff contends, the ALJ should have relied on the opinions of Drs. Dhillon, Stenbeck,

14    and Ju, the Court does not see how the ALJ erred in relying in the opinions of Dr. Dipsia rendered

15    at about the same time.  Put another way, for opinions rendered at nearly the same point in time,

16    Plaintiff cannot credibly argue that the ALJ should have relied on some but should have rejected

17    others as outdated.  To the extent Plaintiff contends the opinions of Drs. Dipsia and Samplay are

18    unreliable because the doctors did not consider evidence entered into the record after their

19    assessments in 2017, Plaintiff has not identified which specific items of evidence would

20    undermine the opinions rendered or the ALJ's analysis thereof.

21    **B.**   **Plaintiff's Testimony and Statements**

22    The Commissioner determines whether a disability applicant is credible, and the

23    Court defers to the Commissioner's discretion if the Commissioner used the proper process and

24    provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

25    credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

26    F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

27    821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

28    and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

1    evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

2    credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

3    1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

4    and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

5          If there is objective medical evidence of an underlying impairment, the

6    Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

7    because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

8    341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

9          The claimant need not produce objective medical evidence of the
10      [symptom] itself, or the severity thereof.  Nor must the claimant produce
      objective medical evidence of the causal relationship between the
      medically determinable impairment and the symptom.  By requiring that
11      the medical impairment "could reasonably be expected to produce" pain or
      another symptom, the Cotton test requires only that the causal relationship
12      be a reasonable inference, not a medically proven phenomenon.

13      80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
      Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).
14

15          The Commissioner may, however, consider the nature of the symptoms alleged,

16    including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

17    947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

18    claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

19    testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

20    prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

21    physician and third-party testimony about the nature, severity, and effect of symptoms.  See

22    Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

23    claimant cooperated during physical examinations or provided conflicting statements concerning

24    drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

25    claimant testifies as to symptoms greater than would normally be produced by a given

26    impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

27    Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

28    / / /

1    Regarding reliance on a claimant's daily activities to find testimony of disabling

2    pain not credible, the Social Security Act does not require that disability claimants be utterly

3    incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has

4    repeatedly held that the ". . . mere fact that a plaintiff has carried out certain daily activities . . .

5    does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v.

6    Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th

7    Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a

8    claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic

9    restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the

10   claimant was entitled to benefits based on constant leg and back pain despite the claimant's

11   ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home

12   activities are not easily transferable to what may be the more grueling environment of the

13   workplace, where it might be impossible to periodically rest or take medication").   Daily

14   activities must be such that they show that the claimant is ". . .able to spend a substantial part of

15   his day engaged in pursuits involving the performance of physical functions that are transferable

16   to a work setting."  Fair, 885 F.2d at 603.  The ALJ must make specific findings in this regard

17   before relying on daily activities to find a claimant's pain testimony not credible.  See Burch v.

18   Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

19   At Step 4, the ALJ considered Plaintiff's statements and testimony in determining

20   her residual functional capacity.  See CAR 22-25.  The ALJ stated:

21       The claimant is a sixty-year-old female with a college education and a law
         degree.  She alleges she alleges she suffered from "Attention Deficit
22       Disorder," "Anxiety Disorder," "Depressive Disorder," "Bipolar
         Disorder," "Cancer Leukemia CML," vertigo, "tennis elbow," and tinnitus
23       which significantly affects her ability to perform work-related activities.
         Additionally, she takes multiple medications for her conditions and some
24       of these cause nausea, weakness, fatigue, memory loss, loss of reading
         comprehension, and ringing in her ears.  She last worked January 17,
25       2011, as an associate attorney, but stopped because of her conditions.
         However, the record reveals she did do some work after this time, lasting
26       about an hour and half a day, for her husband's business or as a sole
         practitioner (Exhibits 4E; 10E; 13E; 14E; 16E; 19E; 20E; 21E; and
27       hearing testimony).

28   / / /

20

The claimant completed a Function Report form dated April 19, 2017, wherein she reported spending an average day eating meals, watching television, feeding her cat, playing games on her phone, checking in with her son over the phone, taking medications (with reminders), napping, and preparing dinner.  The claimant explained she was limited in her ability to sleep, manage medications, manage her finances, engage in social activities, get along with others, understand, follow instructions, recall information, complete tasks, talk, hear, concentrate, and handle stress or changes in her routine.  However, she is able to care for her cat, attend to her personal care and hygiene, prepare meals, perform household chores, go outside three times a week for exercise class, shop for groceries, go out alone, drive, and walk for a half hour.  She is fearful of talking with others, panics when her phone rings, and does not like leaving the house (Exhibit 10E).

The claimant appeared and testified at the hearing she has worked about twenty-five hours a week since January 2013.  This work was for her husband's company and included clerical duties such filing and indexing.  In addition, she was retained for a probate matter during this time but was unable to continue representing her client in the matter.  She is unable to work because of her fatigue, anxiety, and depression.  She described a lengthy history of depression and recurrent episodes of depression.  In addition, she has persistent anxiety with panic attacks.  She experiences about seven panic attacks in a single month but takes medications on these occasions.  She has a hard time maintaining focus, memory, and concentration.  Her fatigue limits her daily activities to around forty minutes before she requires a nap.  She stated she naps three hours during the day.  She does some laundry, exercises, can drive, and occasionally shops (Hearing testimony).

\* \* \*

Despite her impairments, the claimant has engaged in a somewhat normal level of daily activity and interaction.  The claimant admitted or has been reported to perform activities of daily living including care for her cat, attend to her personal care and hygiene, prepare meals, go outside three times a week for exercise class, shop for groceries, go out alone, drive, travel outside the country, water the flowers, dust, vacuum, do laundry, make beds, wash dishes, and walk for a half hour and/or four days a week (Exhibits 9E; 10E; 19E; 3F; 7F; and hearing testimony).  Some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment.  The claimant's ability to participate in such activities undermines the claimant's allegations of disabling functional limitations.

Additionally, the record reveals the claimant's leukemia remains adequately monitored and treated with chemotherapy and routine visits.  Her lab studies reveal improvement and it does not appear she has required an increase in the frequency of visits to monitor her condition or a higher level of care (Exhibit 3F page 16; and hearing testimony).  While she continues to experience fatigue, the evidence as to the intensity of this fatigue is overall inconsistent with her allegations.  This includes her ability to engage in many activities, described in greater detail above, but including attending to her care, watering plants, performing household

chores, shopping, playing on her phone, working, exercising, and driving. Additionally, according to treatment records during her visits she is consistently noted to report fatigue, but also is observed to be alert, oriented, engaged, and cooperative (Exhibits 12F pages 10 and 22; 3F page 5).

As for the claimant's tinnitus, the record reveals her hearing has been tested and was normal in both ears.  She has undergone several medication adjustments to manage her tinnitus with some reported improvement.  As discussed above, she remains able to play games on her phone, participate in exercise classes, watch television, and travel which indicates the symptoms are not as limiting as alleged (Exhibits 12F page 22; 13F page 8; and hearing testimony).

As for her mental health, the record reveals the claimant has undergone extensive treatment and continues to undergo treatment to manage her mental health.  However, the level of care she required to manage her symptoms appears to have decreased in frequency.  The record does not appear the claimant has required inpatient psychiatric hospitalization or intensive outpatient treatment.  Rather, she undergoes medication and medication monitoring treatment.  In addition, it was often noted her ADHD and anxiety were stable during this time (Exhibit 12F page 10). There is also mention in the record the claimant was not consistently compliant with medications, and in fact at one point discontinued her antidepressant triggering an exacerbation of her symptoms.  However, records reveal once she was restarted on her medication her symptoms and functioning improved (Exhibits 3F page 21; 12F page 18).

Based on this evidence, the undersigned finds that the claimant's subjective allegations are inconsistent with the medical evidence and other evidence in the record.

Id.

The ALJ added the following regarding Plaintiff's leukemia, tinnitus, and mental health issues:

As for the claimant's alleged leukemia, evidence reveals the claimant was diagnosed with leukemia in December 2015.  Since that time, she underwent regular lab testing, chemotherapy treatment, and routine visits to monitor her condition and symptoms.  The claimant reported ongoing fatigue thought to be associated with her medications.  Additionally, she reported joint pain.  However, lab studies revealed improvement in blood work (Exhibits 3F page 13; 12F; and 13F page 8).

As for the claimant's alleged tinnitus, evidence in the record establishes the claimant was diagnosed with tinnitus.  It was reported this was believed to be associated with one of the medications she was taking and after a change in medication her symptoms reportedly improved.  She underwent a hearing test which revealed normal hearing in both ears.  The treatment records reveal the claimant presented for her appointments in no distress and able to communicate with providers (Exhibits 12F pages 10 and 22; and 13F page 8).

1

2

3

4

5

6

> As for the claimant's alleged mental health, evidence in the record establishes the claimant has a lengthy history of mental health treatment even before January 2013.  However, since that time she has undergone continued mental health treatment including medication and medication management treatment.  She has reported persistent depression and anxiety, overall managed, but at times exacerbated by life stressors or non-compliance with medications.  In addition, she reported problems with memory, focus, concentration, and task completion.  However, her mental status findings note some evidence of depressed or anxious mood on occasion, but overall were normal or unremarkable (Exhibits 3F; and 12F pages 12, 13, 15 and 22).

7

Id. at 25.

8

9

10

11

12

13

14

15

16

Plaintiff argues generally: "The ALJ failed to accurately portray [Plaintiff's] accounts of daily activities and instead invoked a generic listing of activities, ignored her testimony when suggesting that her accurate or detailed completion of forms indicated a lack of disability, misevaluated the medical evidence and treatment history, and failed to account for the accumulated evidence of record corroborating her complaints." ECF No. 12-1, pg. 28.   More specifically, Plaintiff also contends: (1) the ALJ improperly discounted Plaintiff's complaints of fatigue associated with leukemia treatment; (2) the ALJ improperly relied on Plaintiff's daily activities; and (3) the ALJ failed to properly consider Plaintiff's complaints related to mental impairments.  See id. at 29-32.

17

    1.   Fatigue

18

Plaintiff argues:

19

20

21

22

23

24

> Although recognizing that leukemia is one of Ms. Rochert's severe impairments (Tr. 20), the ALJ's decision downplays the condition and recognizes virtually no limitations associated with it. One of Ms. Rochert's primary complaints due to her chronic myeloid leukemia being treated with chemotherapy is fatigue related both to cancer and the side effects of her treatment. See (Tr. 71, 74, 80) (hearing testimony). The ALJ discounted her fatigue, finding that: 1) lab studies revealed improvement; 2) the intensity of the fatigue alleged was inconsistent with her daily activities; and 3) she was observed to be alert, oriented, engaged, and cooperative at appointments. (Tr. 24). These reasons are insufficient and do not constitute valid reasons linked to substantial evidence supporting the ALJ's rejection of Ms. Rochert's complaints.

25

26

27

28

> Despite some improvement in lab results, Ms. Rochert continued to require a form of chemotherapy treatment, indefinitely, with tyrosine kinase inhibitors – treatment downplayed by the ALJ through her statement that "the claimant's leukemia remains adequately monitored and treated with chemotherapy and routine visits." (Tr. 24). As noted above, in July 2018 Dr. Ng opined that Ms. Rochert would be unlikely to be able to work in the foreseeable future due to the side effects of her medications.

(Tr. 769). That such treatment causes side effects including profound fatigue is not only well documented in the record, it is recognized as a common side effect experienced by people put on these medications. (footnote omitted).  The agency physicians whose opinion were relied on by the ALJ did not have access to updated treatment records or the opinion by Dr Ng regarding the side effects of Ms. Rochert's medications.

In line with the medical literature and treating opinions rendered in this case, the treatment documentation relates Ms. Rochert's struggle with fatigue. *See, e.g.*, (Tr. 447) (fatigue and night sweats noted on November 30, 2015); (Tr. 438) (January 4, 2016 review of system positive for fatigue); (Tr. 436) (January 19, 2016 note documenting that Ms. Rochert taking a nap when provider called); (Tr. 433) (February 29, 2016 review of system positive for fatigue); (Tr. 428) (tiredness, excessive sleeping noted on April 24, 2016); (Tr. 423) (side effects of fatigue and nausea noted on June 1, 2016); (Tr. 405) (feels tired and fatigued all the time as of December 1, 2016); (Tr. 401) (January 27, 2017 review of system positive for fatigue); (Tr. 800) (positive for fatigue, some memory issues, slight nausea, ongoing fatigue limiting activities, stable tinnitus on July 31, 2017); (Tr. 766) (medications causing significant fatigue, limiting usual daily activities per Activity Status Report dated July 16, 2018). And consistent with the record, Ms. Rochert testified that her major problem with her oral chemotherapy was "the exhaustion and fatigue. I can't do much." (Tr. 74, 80). Ms. Rochert described her tinnitus and nausea, concluding that these two conditions were the most troublesome, as "[i]f I do anything for 40 minutes or an hour then I have to stop and rest. And I usually take a nap during the day." (Tr. 80). The ALJ's assumption that "adequate" ongoing cancer treatment involving chemotherapy somehow undermines complaints of fatigue and supports an ability to sustain full-time work activities (Tr. 24) cannot properly be sustained.

The ALJ, moreover, did not specify which labs allegedly revealed material improvement or contradicted Ms. Rochert's complaints. At the hearing, the ALJ referred to Ms. Rochert's white cell count and asked whether her cancer was in remission. (Tr. 72). When she noted that it was active, not in remission, the ALJ stated, "but your last couple of blood tests seem to be the levels were undetectable of the abnormal white cells[.]" *Id.* Listing 13.00(J)(2)(d), which addresses white cell counts in measuring the severity of the relevant type of leukemia, states that "[i]n cases of chronic leukemia (either myelogenous or lymphocytic), an elevated white cell count, in itself, is not a factor in determining the severity of the impairment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 13.00(J)(2)(d). The ALJ's own lay speculation that these lab studies somehow negated any functional effects from Ms. Rochert's cancer or treatment was misguided.

The ALJ also stated that the Ms. Rochert was listed as "alert, oriented, engaged, and cooperative at appointments." (Tr. 24). However, Ms. Rochert's physicians did not use such findings to measure her level of fatigue and did not find that her presentation at appointments in any way contradicted her complaints of recurrent fatigue. As outlined above, examinations and reviews of symptoms are noted as positive for fatigue throughout the record.

ECF No. 12-1, pgs. 29-30.

/ / /

1        Plaintiff's arguments are persuasive with respect to the ALJ's consideration of her

2   complaints of fatigue that limits her ability to engage in work activity.  The ALJ discounted

3   Plaintiff's statements concerning fatigue associated with leukemia treatment and side effects of

4   medication by stating "lab studies revealed improvement in blood work." CAR 25.  The ALJ,

5   however, does not explain how improvement in blood work negates Plaintiff's fatigue symptoms.

6   Similarly, while the ALJ cites various daily activities she found inconsistent with Plaintiff's

7   allegations relating o fatigue, see id. at 24, as discussed in more detail below, Plaintiff testified

8   that her daily activities are limited by fatigue.  Finally, the ALJ does not explain how Plaintiff

9   being alert and oriented during various medical visits undermines Plaintiff's testimony

10  concerning fatigue.  It is possible for one to experience intermittent fatigue and yet be alert and

11  oriented at the time of a medical visit.  Moreover, during these medical visits, Plaintiff

12  consistently mentioned fatigue related to leukemia treatment as one of her primary problems.  In

13  fact, the record reflects, as discussed in more detail above, that doctors noted fatigue as a side-

14  effect of her medications and recommended medication adjustments to address the issue.

15        The Court finds that a remand is appropriate to allow the agency to more

16  thoroughly consider Plaintiff's subjective complaints of fatigue, which are not susceptible to

17  proof by objective evidence and which appear to be the primary cause of Plaintiff's alleged

18  disability.

19              2.    Daily Activities

20  According to Plaintiff:

21        Additionally, the ALJ's listing of daily activities assumed to be
       inconsistent with the Ms. Rochert's fatigue is invalid for the same reasons
22     discussed above. See pages 13-14, supra. The ALJ cited activities
       including "attending to her care, watering plants, performing household
23     chores, shopping, playing on her phone, working, exercising and driving."
       (Tr. 23). These activities are not inconsistent either with Ms. Rochert's
24     reports of fatigue or the existence of limitations that disable her from
       sustaining full-time work. Her fatigue and side effects are well
25     documented, as noted, and were not legitimately discredited by the ALJ.
       None of the activities cited by the ALJ indicate an ability to perform them
26     for more than an hour at a time.
       Moreover, earlier in the decision, the ALJ misstated Ms. Rochert's
27     testimony by asserting that she testified she "worked about twenty five
       hours a week since January 2013." (Tr. 23) ("The claimant appeared and
28     testified at the hearing, she has worked about twenty five hours a week

1
2
3
4

since January 2013. This work was for her husband's company and included clerical duties such as filing and indexing."). In fact, Ms. Rochert estimated that she had worked twenty five hours *per month*, not per week. (Tr. 54). The ALJ erred with this erroneous characterization of the testimony. And Ms. Rochert did not work after her diagnosis of cancer in 2015, the main cause of her fatigue. The ALJ's discounting of Ms. Rochert's complaints on the basis of her activities was thus flawed.

5

ECF No. 12-1, pg. 31.

6          Again, the Court finds Plaintiff's argument persuasive.  The ALJ listed the

7    following activities which were found to undermine Plaintiff's statements and testimony:

8    (1) caring for her cat; (2) attending to personal care; (3) preparing meals; (4) exercising three

9    days per week; (5) traveling abroad; (6) performing household chores; (7) taking short walks;

10   (8) shopping; (9) playing on her phone; and (10) working part time.  See CAR 24.  Plaintiff,

11   however, has testified that these activities are limited, primarily due to fatigue.  For example, in a

12   function report completed on April 19, 2017, contained in the record at Exhibit 10E, CAR 301-

13   09, Plaintiff stated that she requires assistance caring for her cat.  See id. at 302.  Plaintiff also

14   stated that, throughout the day, she feels like she is going to fall asleep any minute.  See id.  In

15   this regard, Plaintiff also stated that she sometimes sleeps for 12-14 hours in a row and always

16   sleeps during the day for a few more hours due to constant fatigue.  See id.  As to meal

17   preparation, Plaintiff stated that she prepares simple meals.  See id. at 303.  As to household

18   chores, Plaintiff stated that she can only engage in such activities occasionally for a few hours a

19   day "off and on" and that she requires "help and encouragement."  Id.  As for shopping, Plaintiff

20   stated that she can only engage in that task once every month or two.  See id. at 304.  While

21   Plaintiff stated that she can use a checkbook and count change, she also stated that her husband

22   manages paying the bills.  See id.  As for walking, Plaintiff stated that she can only engage in that

23   activity for about 30 minutes before requiring a rest break.  See id. at 305.

24          Similarly, as to working, while Plaintiff testified at the administrative hearing that

25   she engaged in part-time work helping her husband with his business, she stated that she could

26   only do so for about an hour a day.  See id. at 45 (hearing testimony).  As Plaintiff notes, the ALJ

27   misstated this testimony and indicated in the hearing decision that Plaintiff's ability to work 25

28   hours a week – as opposed to 25 hours a month – undermines her credibility.

1       The Court finds that, on this record, the ALJ's reliance on Plaintiff's limited daily

2   activities is misplaced.  Plaintiff's statements and testimony reflect daily activities that are limited

3   in nature.  The ALJ has not explained how these limited daily activities translate into an ability to

4   sustain full-time competitive work.  See Fair, 885 F.2d at 603.  The matter will be remanded to

5   allow for further consideration of Plaintiff's daily activities.

6               3.      Mental Impairments

7       Plaintiff argues:

8           . . .[T]he ALJ failed to properly consider Ms. Rochert's complaints
        related to her mental impairments. An ALJ is required to properly consider
9       the occurrence of bad days as well as good, and must not fall into the
        temptation of formulating an RFC that reflects essentially what a claimant
10      can do on good days, or for short periods, rather than what the claimant
        can perform in a sustained manner – day in and day out, full time, over a
11      considerable period. The crucial inquiry is whether a claimant can *sustain*
        work activities for full workdays over time. Social Security Ruling 96-8p,
12      1996 WL 374184 (S.S.A. 1996), for instance, defines an individual's
        residual functional capacity as the person's maximum remaining ability
13      "to do sustained work activities in an ordinary work setting on a regular
        and continuing basis" and that a "regular and continuing basis" means
14      eight hours a day, five days a week, or the equivalent work schedule.
        (citations omitted).

15          ECF No. 12-1, pgs. 31-32.
16

17      The Court is also troubled by the ALJ's treatment of Plaintiff's subjective

18  complaints related to her mental health.  In particular, as discussed above, the ALJ's reliance on

19  Plaintiff's daily activities does not reflect an analysis of Plaintiff's ability to sustain work-related

20  activities.  Additionally, as also discussed above, there is medical opinion evidence from Dr. Ju

21  and other sources relating to Plaintiff's ability to sustain concentration and focus secondary to

22  fatigue associated with leukemia treatment which the ALJ has not properly addressed.  The matter

23  should be remanded to allow the agency an opportunity to re-evaluate Plaintiff's subjective

24  statements and testimony concerning the impact of her mental health in general and fatigue in

25  particular on her ability to work.

26  / / /

27  / / /

28  / / /

1          **C.      Lay Witness Evidence**

2          In determining whether a claimant is disabled, an ALJ generally must consider lay

3   witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

4   919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

5   testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

6   evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

7   F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony of

8   lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at 919.

9   When rejecting third party statements which are similar in nature to the statements of plaintiff, the

10  ALJ may cite the same reasons used by the ALJ in rejecting the plaintiff's statement.  See

11  Valentine v. Commissioner Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) (approving

12  rejection of a third-party family member's testimony, which was similar to the claimant's, for the

13  same reasons given for rejection of the claimant's complaints).

14          At Step 4, the ALJ considered lay witness evidence offered by Plaintiff's husband.

15  See CAR 24-25.  The ALJ stated:

16          The claimant's spouse, Hans Rochert, submitted a Third Party Function
            Report form dates April 19, 2017, that is overall consistent with
17          statements of the claimant above with the exception he reported knowing
            the claimant since 1994 and at the time he was spending al the time he was
18          not working with the claimant.  He stated he believed the claimant could
            not work because of her conditions.  He indicated she was able to walk for
19          travel, shop for clothes about twice a week, started attending a Zumba
            class in 2016 twice a week, waters the flowers, makes the bed, washes
20          dishes, dusts, vacuums, and is able to get along with others (Exhibit 9E).

21                                      *  *  *

22          The undersigned has read and considered statements from the claimant's
            spouse, in Exhibit 9E, discussed herein above.  Mr. Rochert indicated he
23          spent time with the claimant, when he was not working, and it [is] unclear
            whether the limitations identified are based upon his personal observations
24          or complaints expressed to him by the claimant.  The record reveals the
            claimant is independent in her care, is able to maintain the household
25          when Mr. Rochert is away and attends appointments.  In fact, Mr. Rochert
            noted the claimant engaged in more activities such as watering plants and
26          other household chores.  Overall, the undersigned affords the statement
            medium weight.
27
            Id.
28

                                          28

1    Plaintiff asserts:

2        The ALJ erred by failing to properly evaluate this evidence.
     Instead, the ALJ claimed inconsistency with the medical evidence and
3    then simultaneously asserted that it was consistent with "[t]he opinions of
     Dr. Dipsia and Dr. Samplay" which were "given great weight." (Tr. 26).
4    These outdated opinions, according to the ALJ, "are based upon a
     comprehensive review of evidence in the record and are overall consistent
5    with the . . . statements of third parties and the claimant, and her
     activities." *Id.* As discussed above, this rationale is erroneous. In
6    particular, in the context of the lay evidence, the ALJ's claim of
     consistency is inaccurate and contradicted by the ALJ's own earlier
7    assertion of inconsistency. (Tr. 24). Similarly, the ALJ incorrectly claimed
     that "the above residual functional capacity assessment is supported by"
8    the "statements of third parties[.]" (Tr. 31). The ALJ could not have it both
     ways and was obligated to explain the evaluation of lay evidence in a
9    manner susceptible to meaningful review. This the ALJ failed to do.

10   ECF No. 12-1, pg. 34.

11       Here, the ALJ rejected Mr. Rochert's statements largely based on Plaintiff's daily

12   activities.  As discussed above, the Court finds the ALJ's reliance on daily activities misplaced

13   given the limited nature of such activities due to fatigue associated with leukemia treatment.  On

14   remand, the ALJ should give additional consideration to Mr. Rochert's statement in light of the

15   limited nature of Plaintiff's activities.

16       **D.    <u>Vocational Findings</u>**

17       The Medical-Vocational Guidelines (Grids) provide a uniform conclusion about

18   disability for various combinations of age, education, previous work experience, and residual

19   functional capacity.  The Grids allow the Commissioner to streamline the administrative process

20   and encourage uniform treatment of claims based on the number of jobs in the national economy

21   for any given category of residual functioning capacity.  See <u>Heckler v. Campbell,</u> 461 U.S. 458,

22   460-62 (1983) (discussing creation and purpose of the Grids).

23       The Commissioner may apply the Grids in lieu of taking the testimony of a

24   vocational expert only when the Grids accurately and completely describe the claimant's abilities

25   and limitations.  See <u>Jones v. Heckler,</u> 760 F.2d 993, 998 (9th Cir. 1985); <u>see also</u> <u>Heckler v.</u>

26   <u>Campbell,</u> 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

27   Grids if a claimant suffers from non-exertional limitations because the Grids are based on

28   exertional strength factors only.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b). "If

1    a claimant has an impairment that limits his or her ability to work without directly affecting his

2    or her strength, the claimant is said to have non-exertional . . . limitations that are not covered by

3    the Grids." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

4    Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

5    even when a claimant has combined exertional and non-exertional limitations, if non-exertional

6    limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

7    1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

8           In cases where the Grids are not fully applicable, the ALJ may meet his burden

9    under step five of the sequential analysis by propounding to a vocational expert hypothetical

10   questions based on medical assumptions, supported by substantial evidence, that reflect all the

11   plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

12   where the Medical-Vocational Guidelines are inapplicable because the plaintiff has sufficient

13   non-exertional limitations, the ALJ is required to obtain vocational expert testimony.  See

14   Burkhart v. Bowen, 587 F.2d 1335, 1341 (9th Cir. 1988).

15          Hypothetical questions posed to a vocational expert must set out all the substantial,

16   supported limitations and restrictions of the particular claimant.  See Magallanes v. Bowen, 881

17   F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's limitations, the

18   expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary

19   value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While the ALJ may pose to

20   the expert a range of hypothetical questions based on alternate interpretations of the evidence, the

21   hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by

22   substantial evidence in the record as a whole.  See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th

23   Cir. 1988).

24          At Step 5, the ALJ concluded Plaintiff could perform her past relevant work.  See

25   CAR 31.  The ALJ stated:

26          The evidence in the record reveals the claimant has past relevant work as
             an attorney (DOT 110.107-010) which is sedentary skilled work with an
27          [sic] Specific Vocational Preparation (hereinafter SVP) of 8 and paralegal
             (DOT 119.267-026) which is light skilled work with an SVP of 7,
28          sedentary as performed by the claimant.

1
2
3
4
5
6

> The vocational expert was asked to testify at the hearing as to the claimant's ability to perform past relevant work.  The expert was asked to base the testimony on a hypothetical individual with the same age and education as the claimant.  The vocational expert testified that, given the residual functional capacity detailed above, the hypothetical individual would be capable of performing the claimant's past relevant work.  The undersigned accepts the testimony of the vocational expert on this issue and accordingly finds in comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant was able to perform it as actually and generally performed.

7   Id.

8   Plaintiff contends the ALJ violated Social Security Ruling 82-62 by not making

9   specific findings of fact to support the conclusion Plaintiff can return to her past relevant work.

10   See ECF No. 12-1, pg. 25.  The Court is likewise troubled by the finding that Plaintiff can return

11   to her past relevant work.  As discussed above, the ALJ erred in several instances at Step 4 in

12   evaluating the evidence upon which Plaintiff's residual functional capacity was assessed.  In

13   particular, the ALJ's discussion of Dr. Ju's opinions is inconsistent and confusing.  This is

14   notable because Dr. Ju specifically opined that Plaintiff cannot return to her past relevant work

15   but may be able to engage in work that is less demanding.  See CAR 130.  This opinion is

16   consistent with Plaintiff's statements concerning limitations resulting from fatigue associated

17   with her leukemia treatment.  The Court finds that a remand is appropriate to allow the agency to

18   re-evaluate Plaintiff's vocational potential.

19   / / /
20   / / /
21   / / /
22   / / /
23   / / /
24   / / /
25   / / /
26   / / /
27   / / /
28   / / /

1        **IV.  CONCLUSION**

2              For the foregoing reasons, this matter will be remanded under sentence four of 42

3   U.S.C. § 405(g) for further development of the record and/or further findings addressing the

4   deficiencies noted above.

5              Accordingly, IT IS HEREBY ORDERED that:

6              1.      Plaintiff's motion for summary judgment, ECF No. 12, is granted;

7              2.      Defendant's motion for summary judgment, ECF No. 16, is denied;

8              3.      The Commissioner's final decision is reversed and this matter is remanded

9   for further proceedings consistent with this order; and

10             4.      The Clerk of the Court is directed to enter judgment and close this file.

11

12  Dated:  July 20, 2021

13                                          _____
                                            DENNIS M. COTA
14                                          UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28